IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

GREGORY DUNLAP,

                          Plaintiff,

v.

IMAGING ASSOCIATES, LLC, et al.

                          Defendants.

Case No. 3:14-cv-00143-TMB

ORDER ON MOTION FOR
SUMMARY JUDGMENT
(DKT. 241); MOTION TO
STRIKE (DKT. 215)


## I.    INTRODUCTION

The matter is before the Court on the Motion for Summary Judgment (the "Motion") by Defendant Imaging Associates, LLC ("Imaging Associates").[1] Imaging Associates seeks summary judgment on the two remaining claims at issue: Plaintiff Gregory Dunlap's claim under 31 U.S.C. § 3730(h) for retaliatory discharge in violation of the False Claims Act, and his claim for breach of the covenant of good faith and fair dealing implied in employment contracts under Alaska law.[2] The Motion is fully briefed,[3] and the Court heard oral argument on August 7, 2019.[4] Also before the Court is Dunlap's Motion to Strike, which has been fully briefed.[5] For the reasons explained below, the Motion for Summary Judgment is **GRANTED** and the Motion to Strike is **DENIED AS MOOT**.

---

[1] Dkt. 241.

[2] *Id*. at 26.

[3] Dkt. 241 (Motion); Dkt. 260 (Response); Dkt. 269 (Reply).

[4] Dkt. 284.

[5] Dkt. 215 (Motion to Strike Expert Witness); Dkt. 231 (Response); Dkt.  235 (Reply).

## II.    BACKGROUND

In its present form, this case involves an employment dispute between Dunlap and his former employer, Imaging Associates, for whom Dunlap worked between October 2012 and his termination on August 13, 2014.[6] While the basic facts are not disputed, the parties offer competing narratives regarding Dunlap's tenure and the difficulties that emerged during his time at Imaging Associates. The Court summarizes the background facts and timeline first.

### A.   *Dunlap's Employment with Imaging Associates*

Imaging Associates is a radiology practice based in Alaska offering diagnostic and medical imaging services.[7] Imaging Associates is jointly owned and managed by Interventional and Diagnostic Radiology Consultants, LLC ("IRDC") and the Providence Alaska Medical Center ("Providence").[8] Under an exclusive agreement, Imaging Associates receives physician services from Alaska Radiology Associates, Inc. ("ARA"), a physician-owned professional corporation.[9] During the relevant time period, Dr. Christopher Kottra, Dr. Chakri Inampudi, Dr. Christopher Reed, Dr. Leonard Sisk, Dr. Heather Tauschek, and Dr. Kelly Powers Williamson were all ARA physicians working at Imaging Associates.[10] Drs. Kottra and Inampudi—both of whom were

---

[6] This suit was initially brought as a *qui tam* action, but all such claims have been dismissed. *See infra* Part II.C at 24–26 (Procedural History).

[7] *See* Dkt. 75 at 4. Imaging Associates was previously known as Imaging Associates of Providence, LLC. *Id.* At all times relevant to this case, Imaging Associates maintained facilities in four locations—two in Anchorage, one in Wasilla, and one in Palmer. *See* Dkt. 242-3 at 3. Imaging Associates later consolidated into just two locations. Dkt. 242-5 at 7.

[8] Dkt. 75 at 4. IRDC and Providence are each 50% owners of Imaging Associates. *Id.*

[9] *Id.* at 5.

[10] *Id.* at 5–6; Dkt. 11 at 5–6. Drs. Inampudi, Kottra, Coyle, Powers, and Tauschek were affiliated with Imaging Associates' vein program. Dkt. 242-4 at 13. Dr. Reed did not work in the vein program. Dkt. 242-4 at 14. The Second Amended Complaint also identifies two additional ARA

originally named as defendants in the Second Amended Complaint, but against whom no claims remain—each served as Medical Director of Imaging Associates during a portion of Dunlap's tenure.[11] In addition to oversight from a board of directors, Imaging Associates is managed by a CEO, a position occupied by J. Keith Radecic for the bulk of Dunlap's tenure until Ward Hinger took over as CEO in August 2014 following Radecic's resignation.[12]

      1.  Dunlap's Role at Imaging Associates

      Imaging Associates hired Dunlap as Director of Anchorage Facilities in October 2012.[13] Approximately two months later, in December 2012, Dunlap became Director of Operations[14] for all four of Imaging Associates' facilities.[15] In this role, Dunlap's duties included "overseeing daily operations;" "[a]ssisting [the] CEO in preparing [the] annual budget and capital requirements;" "monitoring monthly income statements;" "[d]eveloping, modifying, and implementing patient care standards, policies, procedures, protocol, and education programs in order to meet patient care

---

physicians, Dr. Jonathan Coyle and Dr. Wandal B. Winn. Dkt. 75 at 5, 6. No claims remain against Dr. Coyle or Dr. Winn, and their names were not mentioned in briefing the Motion.

[11] *Id.* Dr. Kottra served as Imaging Associates' Medical Director until February 2013, when Dr. Inampudi took over. *Id.* Dr. Christopher Reed became Medical Director in October 2014, several months after Dunlap's termination. Dkt. 271 at 2.

[12] *See* Dkt. 260-3 at 8 (Radecic deposition testimony that he submitted his resignation on or about May 1, 2014).

[13] Dkt. 242-2 at 15.

[14] Dunlap's latter role is referred to as "Director of Operations," "Executive Director, Operations," "Executive Director of Operations," and "Executive Director." *See, e.g.*, Dkt. 242-2 at 15; Dkt. 242-5 at 23; Dkt. 242-6 at 8, 23; Dkt. 242-9 at 10. For clarity, the Court will refer to Dunlap's later job title as "Director of Operations."

[15] Dkt. 242-2 at 15. The Second Amended Complaint indicates that Dunlap was initially hired in August 2012, not October 2012. *See* Dkt. 75 at 3. This difference is not material to the present dispute. Deb Terry, who was responsible for human resources at Imaging Associates, testified that Dunlap was promoted because his co-Director of Operations resigned. Dkt. 242-9 at 10.

and staff needs;" "[r]eporting and evaluating compliance concerns to ensure services were delivered properly and cost-effectively;" and other oversight duties.[16] Dunlap was also responsible for training and supervising Imaging Associates' staff.[17] Critically, for purposes of this suit, Dunlap's job duties encompassed reporting and evaluating compliance concerns, and reporting and investigating any fraud.[18]

During the time he was Director of Operations, Dunlap reported to both Imaging Associates' CEO and to the ARA physicians working at Imaging Associates (the "Imaging Associates Physicians").[19] Dunlap asserts that, beginning in early 2013, he observed numerous practices at Imaging Associates that raised compliance concerns, and contends that he expressed these concerns to Radecic and to some of the Imaging Associates Physicians.[20] Imaging Associates does not dispute that Dunlap raised certain concerns; in fact, Imaging Associates hired auditors to investigate certain compliance concerns during the summer of 2013.[21]

---

[16] Dkt. 242-2 at 16. Hinger described Dunlap's responsibilities as "all the clinical and administrative aspects of Imaging Associates" including "the technologists that operate the equipment, the credentialing for that equipment," "all the front desk activities," "revenue cycle management" and other responsibilities. Dkt. 242-5 at 4, 5.

[17] Dkt. 242-3 at 4–5. Dunlap stated during his deposition that he supervised all staff, including front desk staff, except for employees at Imaging Associates' Tudor Road office. *Id.* at 5.

[18] Dkt. 242-4 at 15–16. Radecic further testified that Dunlap's role included "ensuring that [Imaging Associates was] compliant with governmental regulations" and "operations and processes." Dkt. 242-6 at 37.

[19] Dkt. 242-2 at 15 ("I reported to J. Keith Radecic and Ward Hinger and other physicians who assigned me duties.").

[20] The details of these concerns are provided *infra* Part II.B.2 at 20–24. No evidence suggests that Dr. Tauschek or Dr. Powers Williamson were ever aware of Dunlap's compliance concerns.

[21] *See, e.g.*, Dkt. 241 at 11 ("During early and mid-2013, Plaintiff was involved in four compliance concerns related to the vein program[.]"); Dkt. 242-3 at 11, 12 (Dunlap testimony describing

It is also undisputed that, from spring 2013 through his termination, staff and physicians at Imaging Associates became dissatisfied with Dunlap's performance.[22] Radecic—who at the time was Dunlap's supervisor and Imaging Associates' CEO—testified that he first became aware of concerns regarding Dunlap's performance during spring 2013, but was initially lenient with Dunlap and "cut him slack" because of both his own management style and because of stressful events in Dunlap's personal life.[23] Dunlap does not dispute this; in fact, Dunlap recalls Radecic telling him, sometime in April 2013, that he was "going to have trouble" if his performance did not improve.[24]

Despite Radecic's counseling, Dunlap's performance issues did not resolve. Ultimately, Drs. Inampudi, Kottra, and Reed all requested that Radecic terminate Dunlap's employment; this push became particularly strong by the spring of 2014.[25] By March 2014, even Radecic's support had eroded, with Radecic conceding to Dr. Inampudi, "I have been a supporter for a long time, but

audits); Dkt. 242-13 at 9–13 (copy of the vein program audit performed by Aegis Compliance and Ethics Center, LLP ("Aegis") in summer 2013. *See also* Dkt. 121 at 5–6.

[22] Details provided *infra* part II.B.1 at 11–20.

[23] Dkt. 242-6 at 25–26. Radecic further explained that it was his normal policy with staff—including Dunlap—to "help them through the tough time" rather than penalizing that individual. *Id*. at 25. Radecic also testified that Imaging Associates explored the possibility that Dunlap's duties in managing all four facilities were "overwhelming," and asked Dunlap if he would "want to hire a second manager and separate those duties back again," but stated that Dunlap "did not want that to occur because he felt that he could handle it all[.]" Dkt. 260-3 at 16.

[24] Dkt. 242-4 at 32.

[25] Dkt. 242-6 at 15. Dr. Inampudi stated that he asked Radecic to terminate Dunlap's employment "since December of 2013, or November," and confirmed that he reiterated these concerns to Hinger in August 2014. Dkt. 242-7 at 10. Dr. Reed testified that in December 2013, "there was a strong push to fire [Dunlap]" from Radecic and Dr. Inampudi, who were "frustrated" with Dunlap's performance and the staff complaints about Dunlap. Dkt. 242-8 at 13. However, Dr. Reed opposed terminating Dunlap in December of 2013, stating that he "made the strong plea that [Dunlap] not be terminated before . . . Christmas and the holidays." *Id*. at 14.

it's really starting to wane," and stating that while Dunlap "still has some good points," that aspects of his performance had become "completely unacceptable."[26]

In April 2014, Radecic informed Dr. Inampudi of his decision to terminate Dunlap.[27] Radecic directed Debra Terry, the Administrative Director and staff member responsible for human resources issues, reached out to The Human Resources Umbrella, LLC ("HR Umbrella"), a human resources consulting firm, to begin a confidential search for a new Director of Operations.[28] On May 1, 2014, Radecic signed an engagement letter with HR Umbrella to formally begin that process.[29]

However, a number of events during April and May of 2014 complicated this timeline and process. First, in April 2014, Imaging Associates transitioned to a new picture archival and communication system ("PACS"), the digital system used for storing and sharing patient images.[30] When the new PACS system went live on April 2, 2014, the transition—which Dunlap played a role in organizing and managing—was riddled with problems that lasted into May of 2014.[31]

---

[26] Dkt. 245-11 at 1.

[27] Dkt. 242-6 at 30. Radecic stated that he did not inform Dunlap of this decision. *Id*.

[28] Dkt. 242-9 at 13–14 (Terry Deposition). *See also* Dkt. 242-12 at 1–4 (HR Umbrella engagement letter and documentation beginning recruitment for new Director of Operations).

[29] Dkt. 242-12. *See also* Dkt. 242-6 at 29–30.

[30] *See* Dkt. 242-7. Prior to this implementation, Imaging Associates relied on a PACS system that was shared with Providence. *See* Dkts. 245-12; 245-5.

[31] *See, e.g.*, Dkt. 246-10 at 1–3 (Dunlap email enumerating difficulties that occurred as a result of PACS rollout, including migration problems, issues with a "FAX server," workflow challenges with administered contrast fields, problems editing ultrasound and MRI exam descriptions, mammography workflow difficulties, and describing "a daily barrage of missile strikes sent out by these unhappy physicians and their staff"); *id*. at 4–5 (Dunlap email noting that "[m]any issues are still outstanding, some large and some small"); Dkt. 246-11 at 1–2 (describing ongoing progress with resolving certain PACS issues, but noting continued difficulties, *e.g.*, "[w]e are still several weeks away (at best) for the breast imaging workflow issues to be resolved."); *id*. at 3 (Dunlap

2. Underline Dunlap's Providence Integrity Line Phone Call

In the midst of the PACS transition, on April 22 and 24, 2014, Dunlap called a compliance hotline, the Providence Health and Services Hotline, maintained by Providence Hospital (the "Providence Integrity Line") and reported concerns about certain practices at Imaging Associates.[32] Shortly thereafter, in early May 2014, Stephanie "Stevi" Morton, an Imaging Associates' board member, followed up with Dunlap, and he described his specific concerns.[33] On May 14, 2014, Radecic met with Morton and learned that an anonymous caller had raised concerns about Imaging Associates.[34]

As a result of the call, Imaging Associates retained HR Umbrella to investigate the allegations.[35] HR Umbrella interviewed eighteen employees, including Dunlap, over a twelve day period in June 2014.[36] On June 30, 2014, HR Umbrella issued a final report summarizing its findings, which was then shared with the Imaging Associates Physicians, management, and board

---

email describing PACS rollout, stating "[i]t's not been easy, at times it has been downright ugly"). These emails are dated through May 12, 2014. Dkt. 246-13 at 1.

[32] Dkt. 242-4 at 33.

[33] Dkt. 242-3 at 4. *See also* Dkt. 242-2 at 5–6 Dunlap's specific allegations are described in additional detail *infra* Part II.B.2. at 23–24. These concerns primarily pertained to Imaging Associates' vein program, the implementation of PACS, and complaints of workplace hostility. *See* Dkt. 242-2 at 5–6.

[34] Dkt. 242-13 at 1.

[35] *See id.* ("On June 1, 2014, HR Umbrella received an email to proceed with an investigation regarding an anonymous complaint filed through the Providence Health and Services Hotline in Washington State.").

[36] Dkt. 242-13 at 1, 4. *See also* Dkt. 242-3 at 10.

members.[37] The report concluded that "the CEO and Medical Director were aware of the issues and addressed each of those raised in the complaint at some time in the past,"[38] and HR Umbrella's recommendations were limited to suggestions for Imaging Associates to improve employee HR resources and training.[39]

Dunlap's anonymity was maintained throughout this process. Moran did not reveal Dunlap's identity as the Providence Integrity Line caller until after Dunlap's termination.[40] No evidence suggests that any of the Imaging Associates Physicians were aware of Dunlap's identity as the Providence Integrity Line Caller. Dr. Reed stated that he did not know who the Providence Integrity complainant was; and Dunlap stated that he did not know if Dr. Reed identified him as the caller.[41] Dr. Inampudi similarly indicated that he did not know the identity of the caller.[42] However, upon receipt of the HR Umbrella report, Radecic testified that he deduced the identity of the caller, and that because of this, he stopped the search for Dunlap's replacement.[43]

---

[37] Dkt. 242-13 at 1; Dkt. 260-41 at 1—2. Radecic testified that the report was "shared at an Imaging Associates board meeting of which there were both Providence and ARA individuals present." Dkt. 242-6 at 14.

[38] Dkt. 242-13 at 6.

[39] *Id*. at 6–7.

[40] Dkt. 242-10 at 3–4.

[41] Dkt. 242-8 at 10–12 (Reed Testimony); Dkt. 270-1 at 3–5 (Reed testimony); Dkt. 242-4 at 18 (Dunlap testimony).

[42] Dkt. 242-7 at 20–22.

[43] Dkt. 242-6 at 12, 16.

Dunlap filed this suit—initially under seal as a *qui tam* action—on July 24, 2014.[44] Dunlap admits that no one at Imaging Associates knew he had filed this suit at the time of his termination.[45]

3.  Dunlap's Termination

In early May of 2014, Radecic announced to Imaging Associates that he would be stepping down as CEO.[46] The transition to a new CEO occurred in early August 2014, when Hinger took over from Radecic as CEO of Imaging Associates.[47] During his first week on the job, Hinger requested that Terry schedule meetings with staff, physicians, and management at Imaging Associates to bring him up to speed on the organization.[48] Dunlap was scheduled to be on vacation during Hinger's first week but nonetheless came to the office on August 1, 2014 for a meeting with Hinger.[49] Dunlap asserts that their meeting lasted nearly eight hours, during which he relayed his compliance concerns to Hinger and informed Hinger that he was the Providence Integrity Line caller.[50] Hinger does not recall Dunlap disclosing his identity as the Providence Integrity Line caller during the August 1, 2014 meeting; however, for purposes of summary judgment the Court

---

[44] Dkt. 1.

[45] Dkt. 242-3 at 14.

[46] *See* Dkt. 246-14 at 1. The record does not include the exact date that Radecic notified Imaging Associates of his upcoming resignation but indicates it occurred during May 2014.

[47] Hinger and Radecic overlapped to transition the position, with Hinger beginning his employment on or about August 1, 2014 and Radecic leaving Imaging Associates on August 12, 2014. *See* Dkt. 260-34 (Hinger calendar); Dkt 260-40 at 1 (Radecic goodbye email).

[48] Dkt. 242-5 at 6–7. Hinger testified that this was part of his effort to learn the "full operational status as to their respective departments, metrics . . . strengths, weaknesses, opportunities, and threats so that [he] could start prioritizing [his] efforts." *Id*.

[49] Dkt. 242-3 at 6–8.

[50] *Id*. at 6, 7. For example, Dunlap asserts that he told Hinger about the pre-filled syringes incident "as an example of the way the program was running." Dkt. 242-4 at 27–28.

accepts Dunlap's assertion that Hinger knew he was the Providence Integrity Line caller as of August 1, 2014.[51]

Hinger testified that when he took over, Radecic, Dr. Inampudi, and the "other physician leaders," were "very concerned about [Dunlap's] performance."[52] Hinger requested "some time to evaluate and do my own quick review,"[53] but ultimately concluded that "it was not possible to retain Gregg Dunlap due to a variety of performance issues" including "his relationship with the staff," lack of trust, and lack of communication.[54] Emails exchanged between Hinger, Radecic, and Terry indicate that Hinger resumed working with HR Umbrella to replace Dunlap on or about August 6, 2014.[55] Hinger stated that it was his decision to terminate Dunlap.[56] Hinger, acting on behalf of Imaging Associates, terminated Dunlap on August 13, 2014.[57] Although Imaging

---

[51] *See* Dkt. 241 at 23. Imaging Associates concedes that, for purposes of this Motion, the Court must accept Dunlap's assertion. *Id.*

[52] Dkt. 242-5 at 14.

[53] *Id.* at 14–15. *See also id.* at 19 (Hinger testified at deposition that at the time he took over, some of the Imaging Associates Physicians "were expressing concerns about [Dunlap's] performance" but that he "told them that, as the incoming CEO, that I wanted to make my own determination.").

[54] *Id.* at 17. Hinger described the relationship between Dunlap and the Imaging Associates staff as "irreparable," stating that "the relationships between [Dunlap] and the staff, particularly the clinical staff[,]" was "really dysfunctional," that there was a "lack of trust," and that cooperation "had all been destroyed." *Id.* at 21. Hinger also enumerated several performance issues that were reported to him, including issues with "credentialing of equipment," Dunlap's management of front desk staff, and other problems. *Id.* at 20–21. Hinger also noted that Dunlap had a romantic relationship with another Imaging Associates staff member, Anita Moran, which he said was "just another example of . . . poor decision making on his behalf." *Id.* at 23.

[55] Dkt. 243-2 at 1.

[56] Dkt. 242-5 at 19. Hinger had the authority to do so. *Id.*

[57] Dkt. 242-3 at 13. *See also* Dkt. 11 at 3–4.

Associates offered Dunlap a severance package, Dunlap declined because he had already initiated this suit under seal.[58]

### B. Dunlap's Performance Issues and Dunlap's Compliance Concerns

Dunlap concedes that there were deficiencies with his performance as Director of Operations. The crux of Dunlap's claims, however, is that it was his decision to voice compliance concerns—and not the performance issues—that led to his termination. But Imaging Associates offers an account of the problems with Dunlap's performance, and the simultaneous breakdown of his relationship with the physicians, staff, and management at Imaging Associates, which it argues was the reason for Dunlap's termination.

### 1. Dunlap's Performance Issues

Starting in Spring 2013, shortly after Dunlap became Director of Operations, the physicians and staff at Imaging Associates began to express dissatisfaction with Dunlap's job performance. Radecic testified that he began to receive complaints from physicians and staff regarding Dunlap's performance during 2013.[59] Eventually, issues emerged with Dunlap's communication, his management style and relationships with his staff, and his oversight and timely completion of necessary tasks and projects.

Staff and physicians reported communication issues with Dunlap throughout his tenure. Beginning in spring 2013, staff complained to the physicians and to Radecic that Dunlap was unavailable, unresponsive to their concerns, and did not provide timely assistance.[60] For example, emails dated March 2013 between Dr. Inampudi and another doctor, Dr. Kelly Powers, states that

---

[58] Dkt. 242-3 at 13–14.

[59] Dkt. 242-6 at 25–26. *See also* Dkt. 242-6 at 24–27, 31.

[60] Dkt. 242-5 at 9, 11–12.

"emails to Gregg [Dunlap] often go unanswered for some time[,]" causing "small avoidable things to keep building up, creating frustration and in some cases, chaos[.]"[61] Similarly, emails from Pamela Buchanan, a Sonographer, to Dunlap and Terry sent in March and April 2013 indicate that her performance reviews—which Dunlap performed—were overdue.[62] Dr. Inampudi, the Medical Director for Imaging Associates during the majority of Dunlap's tenure, stated that he "couldn't even get a hold of [Dunlap] sometimes when he called him" and that often, he could "barely even find" Dunlap.[63]

These problems continued throughout Dunlap's tenure. Dr. Reed testified that, over time, Dunlap "became less and less responsive to his job obligations;" and that he personally "became more and more frustrated by [Dunlap's] lack of follow-through[.]"[64] An email from Imaging Associates employee Nina Caterinichio to Dr. Reed on July 10, 2014, describes her efforts to resolve ongoing problems, and states "I know better now than to think [Dunlap] would be helpful in these situations."[65] And, staff member Yonild Lian, a PET/CT Technologist, stated in his

---

[61] Dkt. 245-3 at 1. In her email, Dr. Powers questioned whether Dunlap was overwhelmed by the scope of his responsibilities and suggested that additional administrative support for Dunlap might alleviate the issues. *Id*. Nonetheless, her email made clear that Dunlap's lack of responsiveness and follow through was creating problems for her staff, whether intentionally or not. *Id*.

[62] Dkt. 245-4 at 1. Dunlap asserts in his statement of disputed facts that he "conducted reviews every quarter, as directed by management," but provides no evidence to support this assertion. Dkt. 281-1 at 19. Accordingly, this fact is not disputed.

[63] *See* Dkt. 242-7 at 15. Dr. Inampudi also stated at deposition that, by November 2013, he was receiving complaints about Dunlap, and Dunlap was "nonresponsive, not available, not proactive" and "basically showed no interest or enthusiasm in work[.]" *Id*. at 11.

[64] Dkt. 242-8 at 3. Dr. Reed also recounted that he "told [Dunlap] that he needed to be responsive to our employees when they asked for help[,]" that "people were worried about what [Dunlap] was doing all day[,]" and stated that, by December 2013, "there were many examples where I pointed out deficiencies that he should have been on." *Id*. at 6.

[65] Dkt. 246-16 at 1–2.

declaration that Dunlap "was generally unresponsive," and that he "had to elevate [his] concerns to Dr. Reed because of Mr. Dunlap's failure to perform his job."[66] Hinger testified that, when he took over as CEO in August 2014, "technologists were complaining that he [Dunlap] was never around [and] never available to talk to."[67]

Dunlap also had poor working relationships with many staff members at Imaging Associates. In particular, his relationship with the staff he supervised was often contentious. Radecic testified that Dunlap "had conflicts with some of the staff at some of our locations,"[68] and stated that on multiple occasions, he counseled Dunlap on "how [management] should be treating staff."[69] Dr. Reed also received "a lot of complaints from our employees . . . about the way [Dunlap] treated them" and that he had "a lot of employees come to me latter half of 2013, certainly 2014, some in tears about the way he had talked to them or treated them."[70] Terry, who was responsible for human resources issues, identified several staff members during her deposition who came to her because they felt mistreated by Dunlap.[71] Terry further stated that two

---

[66] Dkt. 247 at 2. A June 30, 2014 email from Lian to Dr. Reed dated details numerous issues that he asserts were raised with Dunlap but not responded to. Dkt. 243-3 at 1–3. Dunlap challenges the contents of these complaints and whether Lian's opinions are valid, but Dunlap does not dispute the fact of the email or that these concerns were relayed to Dr. Reed and subsequently to Radecic and Hinger. Dkt. 281-1 at 16–17. Moreover, Dunlap has not produced any evidence that would tend to create a genuine dispute of material fact other than his own assertions. *Id.*

[67] Dkt. 242-5 at 11–12. Hinger stated that these complaints specifically came from Rick Willis, the lead CT technologist, and Lian among others. *Id.* at 11.

[68] Dkt. 242-6 at 3–4.

[69] *Id.* at 20.

[70] Dkt. 242-8 at 3.

[71] *See* Dkt. 242-9 at 6–7.

individuals—Cheryl Nino and Bridget Stenger—resigned because of Dunlap's treatment of them in the workplace.[72]

Perhaps most notably, Dunlap clashed with Janet Stookey, the registered nurse who headed Imaging Associates' vein program.[73] Dunlap testified that his "disagreements [with Stookey] all hinged primarily on the vein program," but acknowledged that he made derogatory remarks about Stookey to other individuals, including Dr. Reed.[74] In one email from Dunlap to Dr. Reed, Dunlap referred to Stookey as "an idiot" and blamed her for the problems he saw with the vein program.[75] By fall of 2013, Drs. Inampudi, Kottra, and Sisk decided it was necessary to remove Dunlap from supervising Stookey completely.[76]

By 2014, Dunlap's relationships with many staff members had deteriorated. In fact, Dr. Reed recounted that when Radecic announced his resignation as CEO in May 2014, numerous staff members approached Dr. Reed and expressed concerns that Dunlap would be left in charge

---

[72] *Id*. at 7–8. Dunlap, in his statement of disputed facts, argues that the Court should not consider the complaints from Cheryl Nino as established fact because Nino was "one of four employees at [Imaging Associates'] Bogard location in Wasilla who were undermining administration" and because she sent her resignation letter to all Imaging Associates employees, drawing criticism from Dr. Inampudi and Radecic. Dkt. 281-1 at 2. Despite these assertions, and regardless of the reasons, the fact that Nino blamed Dunlap in her resignation is not disputed.

[73] Dkt. 242-4 at 10; Dkt. 242-6 at 20; Dkt. 242-8 at 8.

[74] *See* Dkt. 242-4 at 10.

[75] Dkt. 246-2 at 1. Dr. Reed testified that Dunlap "shared his dislike for [Stookey] on multiple occasions with me." Dkt. 242-8 at 8.

[76] Dkt. 242-6 at 17; Dkt. 260-3 at 7–8. Dunlap asserts in briefing this change was because of his compliance concerns regarding the vein program but does not provide any evidence in support of this assertion. *See* Dkt. 270 at 5. In fact, Dunlap testified that he did not know "why the decision was made" to separate him from Stookey. *See* Dkt. 242-4 sat 17. After the separation, Stookey reported directly to Radecic. Dkt. 242-8 at 8.

upon Radecic's departure.[77] Dr. Reed stated that "multiple people suggested that they would not stay in the organization much longer" if Dunlap were left in charge, and "would begin seeking other employment."[78] Some of the Imaging Associates Physicians were sufficiently concerned by these complaints that they took steps to avoid this result:[79] on May 20, 2014, Radecic announced via email that Terry would take over "personnel management and general operations" duties and would act as "everyone's primary point of contact for personnel or day to day center issues" during the CEO transition. [80]

While Dunlap may dispute whether these complaints were fairly leveled against him, the fact of their existence—and that physicians and management at Imaging Associates were aware of them—is not disputed.[81] In fact, the HR Umbrella report indicates that three employees told

---

[77] Dkt. 242-8 at 19. Dr. Reed specifically said that employees were worried "that they would be completely left at [Dunlap's] mercy." *Id.*

[78] *Id.*

[79] *Id.* at 19–21. An email from Dr. Reed to Hinger on August 22, 2014 states that, as a result of the employee concerns, "[Dr. Inampudi] and I insisted that Keith [Radecic] publicly remove Gregg [Dunlap] from direct personnel supervision and place Deb Terry in that role until we could locate a new CEO . . . ." Dkt. 246-14 at 1.

[80] Dkt. 246-14 at 1–2 (further stating that Dunlap's "interim role will be more administrative and less on the general day to day operations of the centers and personnel management").

[81] *See, e.g.*, Dkt. 281-1 at 1–3. For example, Dunlap also argues that complaints by one employee, Nino, are not credible because of testimony from Radecic that Nino's comments were made in response to certain changes made by management that Dunlap had communicated to staff. *See id.* at 2; Dkt. 260-3 at 14. However, it is not disputed that Nino advanced these complaints about Dunlap, and that her complaints were known around Imaging Associates. Dkt. 260-3 at 14–15. Radecic testified that he was "quite sure" he discussed Nino's complaints with Dunlap and coached Dunlap that he needed to "figure out how [he was] going to work with people better." *Id.* at 14.

investigators that they "felt their jobs had been threatened by the Operations Director" and that they "did not like his 'bullying approach' to resolving conflict."[82]

The record also contains several specific examples of lapses in Dunlap's performance that caused problems for Imaging Associates. For example, on August 14, 2013, a patient at one of Imaging Associates' facilities had an adverse reaction to a procedure,[83] and the physicians and staff on location were unable to locate a "crash cart" that should have been available with the supplies necessary to stabilize the patient until emergency services could be contacted.[84] Shortly thereafter, Dr. Inampudi emailed Dr. Sisk and Radecic, stating "these are the kind of things Gregg [Dunlap] should be on top of" and requesting that Radecic seek "a formal response" from Dunlap.[85] It is undisputed that ensuring the availability of crash carts was one of Dunlap's responsibilities, and that the incident was viewed very negatively by the physicians at Imaging Associates and Radecic.[86]

---

[82] Dkt. 242-13 at 6.

[83] Dkt. 245-7 at 1.

[84] Dkt. 245-7 at 1 (August 14, 2013 email from Dr. Sisk describing the incident). *See also* Dkt. 242-6 at 22–23 (Radecic deposition describing the incident).

[85] Dkt. 245-7 at 1. Radecic testified that he followed up with Dunlap as to why the crash cart was unavailable but that Dunlap "did not have a good response as to why it was not readily available." *Id.* at 24.

[86] Dkt. 242-6 at 23. Approximately two weeks prior to the incident, on August 1, 2013, Dr. Tauschek emailed the other physicians to let them know that she had "asked Gregg [Dunlap] to print up instructions for treating contrast reactions and to place them in . . . each AP control room." Dkt. 245-6 at 1. Dr. Inampudi specifically stated that it was Dunlap's "responsibility to make sure that the crash cart is in place" and that staff were "trained" and "informed" on where to find it and how to use it. Dkt. 242-7 at 18. Dr. Inampudi's email on August 16, 2013 states that if the reaction had been more severe, "heads would roll." Dkt. 245-7 at 1. In responding to these allegations, Dunlap asserts in his Statement of Disputed Facts that he "did indeed ensure that each location had a crash cart," but his only support is an email that Dunlap sent on August 16, 2013, after the incident had already taken place. *See* Dkt. 281-1 at 22; Dkt. 260-30 at 2.

Another area of concern was Dunlap's management of Imaging Associates' American College of Radiology ("ACR") accreditation. As described by Radecic, the ACR accreditation process ensured that Imaging Associates was "officially licensed in the state and nationally recognized" to perform specific procedures.[87] To maintain accreditation, Imaging Associates needed to submit required documentation, signatures, and images in a timely fashion for each modality.[88] Dunlap's role included oversight of this entire process, and it was Dunlap's job to coordinate and manage the accreditation process.[89]

This process proved problematic throughout Dunlap's tenure.[90] November 2013 emails exchanged between Dr. Reed and Radecic indicate ongoing issues with CT accreditation.[91] And, a December 2013 email forwarded from Rick Willis, the Lead CT Technologist at Imaging Associates,[92] indicates that an application to renew the CT accreditation for the facility was overdue, and another email in February 2014 indicates that images were missing from another accreditation package.[93] Radecic testified that he counseled Dunlap regarding the importance of improving management of the ACR accreditation process; however, issues remained.[94] In April

---

[87] Dkt. 242-6 at 7.

[88] *Id.* at 7. *See also* Dkt. 244 at 2–3 (describing ACR process for CT modality). Modality refers to each type of imaging procedure that Imaging Associates performed; *i.e.*, the accreditation was done separately for CT, MRI, mammography, ultrasound, and each of the other modalities that Imaging Associates maintained. *See* Dkt. 242-7 (explaining use of term modality).

[89] Dkt. 242-7 at 17. *See also* Dkt. 242-4 at 31.

[90] *See, e.g.*, Dkt. 242-5 at 13; Dkt. 242-6 at 27–28; Dkt. 244-1; Dkt. 245-8 at 1.

[91] Dkt. 246-6 at 1.

[92] Dkt. 244 at 2.

[93] Dkt. 244-1 at 1; Dkt. 260-14 at 1.

[94] Dkt. 242-6 at 27, 33–35.

2014, emails between Dr. Inampudi and Dr. Sisk, which were shared with Radecic and Dr. Reed, expressed frustrations with Dunlap's performance, with Dr. Sisk complaining Dunlap "is not maintaining our ACR status for various modalities" and worrying that Imaging Associates would "need to pay for an extension" to get the work done on time.[95] Radecic, in response to that email, wrote "this is basic stuff that is [Dunlap's] responsibility to get done and keep us accredited."[96] Hinger stated that when he took over as CEO, the lead technologists were "concerned" that Imaging Associates would be unable to meet the deadlines to maintain ACR credentials on certain equipment "because of Mr. Dunlap's leniency in communication and absence from the office."[97]

Dunlap does not dispute that these difficulties occurred and acknowledged that he "did not bring together the tracking soon enough to be a little bit more out in front of it."[98] However, he argues that he was not responsible for the problems that arose.[99] Dunlap further contends that the process of ACR accreditation was eventually successful, even if the implementation was poor, maintaining that he "did not miss it," a reference to his contention that the process was ultimately acceptable because no accreditations actually lapsed during this tenure.[100]

---

[95] Dkt. 245-13 at 1. *See also* Dkt. 242-6 at 26–27.

[96] Dkt. 245-13 at 2.

[97] Dkt. 242-5 at 9.

[98] Dkt. 242-4 at 31.

[99] *See* Dkt. 281-1 at 4–6.

[100] Dkt. 242-4 at 31. Dunlap also asserts that ultimately, "[t]here were no ACR issues" at Imaging Associates. Dkt. 281-1 at 7. However, his own tracking spreadsheet for the ACR accreditation process indicates two modalities that failed or were unable to pass accreditation. *See* Dkt. 260-15 at 1–2. The spreadsheet specifically notes, for the modality "stereotactic breast biopsy," that the modality "failed due to clerical and procedural errors" and includes the notation "resubmitting." *Id.* Similarly, for the "nuclear med" modality, the notation indicates "unable to pass image quality;

The final area of concern was Dunlap's role in the poorly executed implementation of Imaging Associates' new PACS system in spring 2014. Dunlap was not involved in selecting or purchasing the new system,[101] but was tasked with rolling out the new system together with Radecic and an IT professional named Jason Roach, who Dunlap supervised.[102] Dunlap was, at minimum, responsible for training and supporting staff during the transition, which proved to be riddled with problems.[103]

Although numerous factors contributed to the disastrous rollout, Radecic and the Imaging Associates Physicians felt that Dunlap did not successfully perform his assigned duties to facilitate the PACS implementation. Radecic stated that Dunlap generally "fell short in managing" the PACS rollout.[104] Dr. Reed expressed particular frustration with Dunlap's lack of responsiveness to the problems the front desk was facing when fielding calls from physicians who were unable to

---

resubmitting for Planar only[.]" *Id.* It was established at oral argument that Dunlap created this spreadsheet and used it to track and monitor the accreditation process. Dkt. 284.

[101] Dkt. 242-8 at 7 (stating Dunlap was not responsible for "the selection or purchasing or the IT side of" the PACS system but was responsible for the rollout "operationally").

[102] Dkt. 242-7 at 14. *See also* Dkt. 242-6 at 4 (stating that Jason Roach "reported to Gregg [Dunlap]"). Dr. Inampudi described Dunlap's role "as the project manager for PACS," stating that the rollout team consisted of Radecic, Dunlap, and Roach. Dkt. 242-7 at 14.

[103] Dkt. 242-4 at 39. Dunlap described his role during the PACS rollout as supporting the staff, training staff on the new technology, and assisting with any issues that arose. *Id.* Dr. Reed characterized Dunlap's role as covering "the build-out of the clinical side"—that is, setting up the software to properly work for the types of exams performed at each location—and "training of the technologists . . . and the front desk staff on how to use the new system." Dkt. 242-8 at 7. *See also* Dkt. 245-9 at 1–2 (Dunlap email on March 25, 2014 setting up staff training for new PACS system); Dkts. 246-10, 246-11, 246-12, and 246-13 (detailing PACS rollout issues).

[104] Dkt. 242-6 at 3.

access necessary records.[105] In describing the incident to Hinger later on, Dr. Reed stated that "there was no training at all on our front end as to how to handle angry referring provider calls," and that Dunlap "never did come through and respond either by phone or email," nor did Dunlap "engage[] in staff training over the handling of these calls," a task that was specifically assigned to Dunlap. [106]

As with other areas of concern, Dunlap does not dispute that issues arose with the PACS implementation; however, he argues that "there were so many external factors" that responsibility for the botched rollout cannot be placed "solely" on him.[107] Dunlap recalls these complaints about his performance with respect to the PACS project, particularly from Radecic, Drs. Inampudi and Reed,[108] but contends that those concerns were "misplaced" because the "PACS project should never have gone live when it did."[109]

In sum, Imaging Associates points to numerous deficiencies with Dunlap's performance, and contends that Hinger fired Dunlap as a result of these problems. Dunlap does not dispute that

---

[105] Dkt. 246-7 at 1–2. In one instance, Dr. Reed requested Dunlap provide a script for front desk staff to respond to callers, but Dunlap failed to do so, despite being informed that there was a need for a short turnaround on the task. *Id*. at 1.

[106] Dkt. 246-7 at 1. Despite an email on April 21, 2014, in which Dr. Reed stated that Dunlap was "here early this morning, working pretty hard," Dr. Inampudi replied "Too bad and too late . . . I regret not firing [Dunlap] in 2013 and not hiring a competent manager to run this project." Dkt. 245-16 at 1.

[107] Dkt. 242-4 at 3. *See also* Dkt. 281-1 at 21. Dunlap contends that the problems stemmed from the software itself and IT problems between Imaging Associates and Providence. *See id.* However, Dunlap does not dispute that there was dissatisfaction with his involvement in the process. *See* Dkt. 281-1 at 21 (quoting Dkt. 260-22 at 6).

[108] Dkt. 242-4 at 4.

[109] *Id.*

aspects of his performance were lacking and recognized that "there were definitely things that I could have improved on at any given point," and "things that got missed and overlooked."[110]

2. Dunlap's Compliance Concerns

Despite these issues, Dunlap, however, argues that the cause of his termination was the compliance concerns that he raised while at Imaging Associates. Dunlap now argues that this conduct was protected activity under the False Claims Act and under Alaska law, and ultimately that he is entitled to relief for retaliatory termination.

The Court notes, at the outset, that Dunlap's specific compliance concerns are imprecisely referenced in his briefing. At oral argument, Dunlap represented that the scope of his compliance concerns were those issues enumerated in a Spring 2013 audit performed by Aegis Compliance and Ethics Center, LLP ("Aegis"), the details of which are described below.[111] Dunlap's briefing, however, also references "billing concerns" that were "outside of [his] job duties," which may reference separate concerns since at deposition, Dunlap testified that Aegis "didn't look into the billing practices."[112] However, Dunlap did not provide any additional detail on the specifics of these billing concerns, nor did he reference any other filing providing such detail. And, the only compliance concerns the Court is aware of involving "billing issues" are certain billing issues that arose as part of, or ancillary to, the concerns enumerated below.

Shortly after becoming Director of Operations, Dunlap asserts, he began raising compliance concerns. First, beginning in February 2013, Dunlap began expressing concerns about

---

[110] Dkt. 242-4 at 30–31.

[111] Dkt. 284. The report from this audit is found at Dkt. 242-13 at 9–13.

[112] Dkt. 260 at 16–17; Dkt. 242-3 at 11.

a laser at Imaging Associates' location on Trunk Road in Wasilla, Alaska (the "Trunk Road Laser").[113] Dunlap believed that Imaging Associates was using the Trunk Road Laser without a valid vendor agreement in violation of Medicare and Medicaid regulations.[114] Dunlap "worked to resolve [this] issue during the spring and summer of 2013," bringing his concerns to the attention of Radecic, Dr. Kottra, and Dr. Inampudi.[115] Dunlap testified, however, that he "eventually dropp[ed] the issue" at the request of Dr. Inampudi and did not raise the issue again with any of the physicians after 2013.[116] By 2014, Dunlap stated that he would "[p]eriodically" ask Radecic about the Trunk Road Laser "in passing" but did not bring up this issue with anyone else at Imaging Associates.[117]

Dunlap also asserts that, during the spring and summer of 2013, he discovered other compliance issues relating to Imaging Associates' vein program. First, Dunlap discovered pre-filled syringes that were not properly labeled and stored.[118] Second, Terry informed Dunlap in spring 2013 that there were pre-signed prescription forms in the desk of Stookey, a registered nurse

---

[113] Dkt. 245-2 at 1.

[114] Dkt. 260 at 4. *See also* Dkt. 242-2 at 12; Dkt. 246-2; Dkt. 246-3 (April 2013 emails between Dunlap, Radecic, Dr. Inampudi, and Stookey regarding the Trunk Road Laser).

[115] Dkt. 260 at 4; Dkt. 260-3 at 11. Radecic testified that Dunlap informed him of his potential compliance concerns regarding the laser. *Id. See also* Dkt. 242-6 at 12; Dkt. 260-22 (deposition of Dr. Inampudi stating that Dunlap raised the issue of the Trunk Road Laser in spring 2013).

[116] Dkt. 260 at 4. Dunlap stated at deposition that he did not know whether his concerns regarding the Trunk Road Laser were resolved, but that he did not raise the issue in 2014 other than mentioning it to Radecic in passing. Dkt. 242-4 at 27.

[117] Dkt. 242-4 at 26–27.

[118] Dkt. 242-4 at 20, 25; Dkt. 242-6 at 10–11.

and director of the vein program.[119] Finally, Dunlap asserts that he harbored concerns about the vein program workflow, asserting that Stookey "worked outside her practice area," in violation of Medicaid and Medicare rules,[120] and that he had concerns about the vein program billing practices in relation to that workflow.[121]

Many of these concerns were timely addressed. Dunlap acknowledges that the issues involving the syringes and prescription pads were both resolved in 2013,[122] and Dunlap testified that he did not raise either issue again internally until the Providence Integrity Line phone call.[123] And, as previously mentioned, Imaging Associates retained outside auditors to explore Dunlap's concerns regarding the vein program.[124] In summer 2013, Radecic hired Aegis to perform an audit of the vein program (the "Aegis Audit").[125] Imaging Associates implemented certain changes in response to the Aegis Audit, but Dunlap contends some issues remained unaddressed.[126]

---

[119] Dkt. 242-4 at 27–28; Dkt. 242-9 at 12.

[120] Dkt. 260 at 5. *See also* Dkt. 75 at 22–24, 25–26.

[121] Dkt. 260 at 5; Dkt. 75 at 28–29. The Court's Order at docket 121 describes Dunlap's billing concerns in further detail, and the Court incorporates that background here to the extent that it is relevant.

[122] Dkt. 242-4 at 25–26, 28; Dkt. 242-9 at 12. Radecic, Terry, Dunlap, Stookey, and Dr. Inampudi were aware of the pre-filled prescription pads and the resolution of that incident. Dkt. 242-4 at 29.

[123] Dkt. 242-4 at 25, 28.

[124] *Supra* at 21.

[125] Dkt. 242-3 at 11–12. The Aegis Audit addressed "the overall process and procedure of the vein program," but not billing concerns or the Trunk Road Laser. *Id.* The Aegis Audit report is found at Dkt. 242-13 at 9–13.

[126] Dkt. 242-3 at 11–12. *See also* Dkt. 242-4 at 20 (stating that "outstanding issues" remained from the Aegis Audit); *but see id.* at 28 (conceding that certain concerns were resolved in 2013).

Dunlap testified that, to the extent he still harbored concerns, by 2014 he only raised them informally with Radecic or Dr. Reed and not with anyone else at Imaging Associates until his call to the Providence Integrity Line in April 2014, when he communicated all his concerns to an Imaging Associates' board member, Morton.[127] According to the HR Umbrella report, the caller—Dunlap—made the following compliance allegations: (1) unlabeled syringes stored by a vein therapist; (2) pre-filled prescription pads; (3) a workflow at the vein center in which a registered nurse was practicing outside her license; (4) references to an unlicensed or unleased laser at the Trunk Road location; (5) concerns about moving to a new "technical platform for the organization" too quickly without adequate testing; and (6) workplace hostility.[128] Dunlap asserts that when he met with Hinger on August 1, 2014, he informed Hinger about these concerns as well.[129]

## C. Procedural History

Dunlap initiated this case on July 24, 2014 while still Director of Operations for Imaging Associates, asserting claims under the False Claims Act, 31 U.S.C. § 3279 *et seq.* ("FCA").[130] After the United States declined to intervene,[131] and after his termination, Dunlap filed an Amended Complaint, adding claims for employment retaliation under the FCA, wrongful termination in violation of public policy, and breach of the covenant of good faith and fair dealing

---

[127] Dkt. 242-4 at 9, 20, 25–26. While the Court assumes this is true for purposes of this Motion, the Court notes that Dr. Reed testified that he had little awareness of Dunlap's concerns because he was unfamiliar with the vein program. *See* Dkt. 242-8 at 10–11. Dunlap provides no other evidence that he continued to raise concerns internally between 2013 and April 2014.

[128] Dkt. 242-13 at 2–3. During the investigation, another employee raised a new, unrelated concern about age-related discrimination, which HR Umbrella concluded was meritless. *Id.* at 5.

[129] Dkt. 242-3 at 7.

[130] Dkt. 1.

[131] Dkt. 9.

implied in employment contracts under Alaska law.[132] Following briefing and oral argument on a joint motion to dismiss,[133] the Court dismissed Dunlap's FCA claims, the claim for wrongful termination in violation of public policy, and several of the named defendants.[134]

On April 26, 2016, Dunlap filed a Second Amended Complaint, reasserting those claims that were dismissed without prejudice and the two employment retaliation claims that were not previously dismissed against a smaller group of defendants.[135] Defendants again moved to dismiss the FCA claims, Counts I-IV, which the Court granted.[136]

What remains before the Court are two claims against Imaging Associates from the Second Amended Complaint: Count V for Retaliatory Discharge in Violation of the FCA; and Count VI for Breach of the Covenant of Good Faith and Fair Dealing implied in Alaska employment contracts.[137] Dunlap contends that he engaged in conduct that is protected under the FCA and Alaska law when: (1) he raised certain internal compliance concerns to Radecic and the physicians at Imaging Associates; (2) he placed a phone call to the Providence Integrity Line in April 2014 reporting these concerns; and (3) he disclosed his identity as the Providence Integrity Line caller,

---

[132] *See* Dkt. 11 (Amended Complaint).

[133] *See* Dkt. 72 (Minute Entry for Oral Argument on January 26, 2016); Dkt. 73 (Transcript).

[134] Dkt. 74. The Court dismissed Counts I-IV without prejudice and Count VI with prejudice. *Id.* Defendants did not move to dismiss the remaining claims, which are now at issue.

[135] *See* Dkt.75 (Second Amended Complaint); Dkt. 121 at 2–3 (Order on Motions to Dismiss).

[136] Dkt. 121. The Court dismissed without prejudice the following claims: Count I as to all defendants, Count II as to Imaging Associates and Dr. Inampudi, and Counts III and IV as to Imaging Associates and Drs. Inampudi, Winn, Coyle, Kottra, Tauschek, and Powers. *Id.* Plaintiff has not refiled those claims and the deadline to do so has now passed.

[137] Dkt. 75 at 42–43; *see also* Dkt. 121 (Order).

and his concerns, to Hinger on August 1, 2014.[138] Dunlap argues that Imaging Associates then fired him in retaliation for this protected activity.

Imaging Associates moves for summary judgment on both claims, contending that Dunlap has failed to state a *prima facie* case for retaliation because he has not demonstrated all of the necessary elements, and further arguing that Dunlap has not rebutted the legitimate non-retaliatory reason for termination that Imaging Associates provided.[139] Imaging Associates also contends that Dunlap failed to plead certain facts that he now asserts as part of the basis for his claims, and should be barred from doing so.[140] Dunlap, in response, maintains that there are disputed material facts which preclude summary judgment.[141] Dunlap also argues that the Second Amended Complaint and factual disclosures during discovery were sufficient to place Imaging Associates on notice of the conduct at issue.[142] Following briefing, the Court heard oral argument on August 7, 2019 then took the matter under advisement.[143]

---

[138] Dunlap also asserted in his complaint and briefing that he engaged in protected activity under the FCA when he filed this suit under seal; however, he later conceded both in briefing and at oral argument that no one at Imaging Associates was aware at the time of his termination that he filed this suit. Dkt. 260 at 18. *See also* Dkt. 241 at 22. Accordingly, this conduct cannot form the factual basis of his *prima facie* case, because the second element—the employer's knowledge—cannot be satisfied. The Court thus declines to further address any claim based on this conduct.

[139] Dkt. 241.

[140] *Id*.

[141] Dkt. 260.

[142] *Id*.

[143] Dkt. 284.

# III.  LEGAL STANDARD

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[144] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[145] In ruling on a summary judgment motion, a court's analysis is focused on "whether there is a genuine issue for trial."[146]

Material facts are those which might affect the outcome of the case.[147] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[148] "There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion."[149] A movant's burden may also be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[150]

---

[144] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[145] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130-31 (9th Cir. 1994).

[146] *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

[147] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[148] *Id.* at 248.

[149] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). *See also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[150] *Celotex*, 477 U.S. at 325.

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[151] "The mere existence of a 'scintilla' of evidence is not enough to create a 'genuine issue of material fact' in order to preclude summary judgment."[152] While the Court must draw all reasonable inferences in favor of the nonmoving party, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.[153] And, "[w]here ... the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy is a question of law suitable for disposition on summary judgment."[154]

## IV.    ANALYSIS

The Court concludes that Imaging Associates is entitled to summary judgment on both claims at issue. First, Dunlap did not plead any facts relating to the August 1, 2014 meeting between Dunlap and Hinger, and thus cannot assert this fact as part of the protected activity that forms the basis for his claims. Second, Dunlap has not stated a *prima facie* case for employment retaliation under the FCA because he has not demonstrated that Imaging Associates knew that his internal complaints were protected activity, and he did not establish that his protected activity was the 'but for' cause of his termination. And, Imaging Associates is further entitled to summary judgment on both the FCA claim and Dunlap's claim for breach of the implied covenant of good

---

[151] *Id.* at 323–24.

[152] *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996) (quoting *United States ex. rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995)).

[153] *Celotex*, 477 U.S. at 323.

[154] *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1262 (9th Cir. 2016) (quoting *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir.2011)).

faith and fair dealing because Dunlap has not rebutted the legitimate non-retaliatory reason Imaging Associates provided for Dunlap's termination.

### A. *Pleading of Alleged Protected Activity Under Fed. R. Civ. P. 8(a)*

The Court first turns to Imaging Associates' contention regarding the sufficiency of Dunlap's pleadings.[155] On this issue, Imaging Associates argues that: (1) the Second Amended Complaint does not clearly allege that Dunlap's internal complaints to Radecic, Dr. Inampudi, Dr. Reed, and Dr. Kottra were part of the protected activity leading to his termination;[156] and (2) that the Second Amended Complaint does not reference the August 1, 2014 meeting between Dunlap and Hinger, thus barring Dunlap from now asserting this event as part of the factual basis for his claims.[157] Dunlap, in response, contends that broad references to these activities in the Second Amended Complaint, and their disclosure during discovery, are sufficient to provide Imaging Associates notice of the factual basis for Dunlap's claims.[158]

"The Supreme Court has interpreted the 'short and plain statement' requirement [of Fed. R. Civ. P. 8(a)(2)] to mean that the complaint must provide 'the defendant [with] fair notice of what the claim is and the grounds upon which it rests.'"[159] The Court agrees that Second Amended

---

[155] Dkt. 241 at 27–29.

[156] Dkt. 241 at 27. Imaging Associates emphasizes that the section of Dunlap's Second Amended Complaint regarding retaliatory discharge identified only the Providence Integrity phone call, and the ensuing conversations relating to that call, as protected activity. *Id.* at 28. Imaging Associates notes that, in the Second Amended Complaint, "[n]one of these internal discussions were included as factual bases for Dunlap's termination," but were referenced therein only in relation to the now-dismissed FCA claims. Dkt. 241 at 28–29 (emphasis from original omitted).

[157] Dkt. 241 at 27.

[158] Dkt. 260 at 8–10.

[159] *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908 (9th Cir. 2011) (internal punctuation omitted) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, (2007)).

Complaint is ambiguous as to whether Dunlap's internal complaints were asserted as a factual basis for his employment retaliation claims, Counts V and VI, or just for the FCA claims, Counts I-IV.[160] However, the Second Amended Complaint describes Dunlap informing Radecic and Drs. Inampudi, Kottra, and Reed about various compliance concerns.[161] The Court thus finds that the pleading is sufficient—albeit minimally—to place Imaging Associates on notice as to the factual basis for Dunlap's allegations.

Regarding the August 1, 2014 meeting between Hinger and Dunlap, however, the Court reaches the opposite result. During oral argument, Dunlap conceded that the Second Amended Complaint makes no reference to the August 1, 2014 meeting between Hinger and Dunlap.[162] Thus, to the extent that Dunlap now advances claims based on this meeting, the Second Amended Complaint "gave the defendants no notice of the specific, factual allegations" on which those claims are based.[163] The Court therefore will not consider the August 1, 2014 meeting as part of the protected activity that Dunlap alleges led to his termination, as he did not plead it as such.

---

[160] Dkt. 75 at 42 (referencing only Dunlap's "good faith reports of fraudulent acts and compliance issues" and his "complaints"); *id.* at 43 (stating that Imaging Associates terminated Dunlap "after he reported fraud and compliance issues"). The Court notes that Dunlap reincorporated all prior paragraphs from the Second Amended Complaint for both counts but did not include clarification on the specific "good faith reports," "complaints," or reporting for these sections. *Id.* at 42–43.

[161] *See, e.g.*, Dkt. 75 at 18–20 (describing Dunlap notifying Radecic and Dr. Inampudi about the Trunk Road Laser); *id.* at 26–27 (stating that Dunlap discussed his concerns about the vein program workflow with the certain of the Imaging Associates Physicians and Radecic).

[162] Dkt. 284. Dunlap maintained that Imaging Associates was on notice about this factual basis for Dunlap's claims because of discovery. *Id.* This is insufficient. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (noting that disclosure of information during discovery and prior to summary judgment "did not make [that information] part of the record and it did not give the [defendants] notice of what allegations [plaintiff] was including in the suit").

[163] *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079 (quoting *Pickern*, 457 F.3d at 968–69 (internal punctuation omitted)).

*B. Prima Facie Case for Retaliation Under the False Claims Act*

The Court now turns to the merits of Dunlap's claim for employment retaliation under the FCA. "The False Claims Act protects 'whistle blowers' from retaliation by their employers."[164] Specifically, 31 U.S.C. § 3730(h) entitles an employee, contractor, or agent to relief if that individual is:

> discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.[165]

To establish such a cause of action, "[a]n employee must prove three elements in a § 3730(h) retaliation claim: (1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because she engaged in protected activity."[166]

"The Ninth Circuit has not expressly determined whether the burden shifting analysis utilized by the courts in analyzing claims under Title VII of the Civil Rights Act also applies to whistleblowing claims under the FCA. However, every court to address this issue directly has concluded an affirmative defense is available to the employer."[167] Thus, the Court will apply the Title VII burden shifting methodology to evaluate Dunlap's claims here.

---

[164] *Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002).

[165] 31 U.S.C. 3730(h)(1).

[166] *Moore*, 275 F.3d at 845. *See also U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268–69 (9th Cir. 1996).

[167] *U.S. ex rel. Berglund v. Boeing Co.*, 835 F. Supp. 2d 1020, 1040 (D. Or. 2011) (citing *to Balmer v. HCA, Inc.,* 423 F.3d 606, 614 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice*, 563 U.S. 826 (2011); *U.S. ex rel. Karvelas v. Melrose–Wakefield Hospital*, 360 F.3d 220, 235 (1st Cir. 2004); *Dookeran v. Mercy Hospital of Pittsburgh*, 281 F.3d 105, 107 (3rd Cir. 2002); *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848, 850–51 (8th Cir. 2000); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 n. 4 (D.C. Cir. 1998).) *See also Moore*, 275 F.3d at 847–48 (adopting the

Under this framework, Dunlap must first demonstrate the three elements above—thus establishing a *prima facie* case for retaliation. The burden then shifts to Imaging Associates to articulate a "legitimate non-retaliatory explanation for the adverse employment action."[168] If Imaging Associates is able to provide such a reason and "successfully rebuts the inference of retaliation," then "the burden of production shifts back to [the plaintiff] to show that [the] proffered explanation is merely a pretext for impermissible retaliation."[169]

### 1. Whether Dunlap Engaged in Protected Activity under the False Claims Act

The first element Dunlap must establish to state a *prima face* case under § 3730(h) is that he engaged in protected activity under the FCA.[170] "[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government."[171]

---

standard for what is sufficient to constitute an adverse employment action under Title VII to apply to claims for employment retaliation under the FCA).

[168] *Berglund*, 835 F. Supp. 2d at 1040 (citing to *Dawson v. Entek Intern.*, 630 F.3d 928, 936 (9th Cir. 2011).

[169] *Id*.

[170] *Hopper*, 91 F.3d at 1269 ("Section 3730(h) only protects employees who have acted 'in furtherance of an action' under the FCA."). Specifically, "[i]nvestigation of regulatory noncompliance alone is insufficient." *Josey v. Impulse Dynamics (USA) Inc.*, 371 F. Supp. 3d 603, 608 (D. Ariz. 2019) (citing *Hopper*, 91 F.3d at 1269). Rather, "the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Hopper*, 91 F.3d at 1269 (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir.1994)).

[171] *Moore*, 275 F.3d at 845–46 (citing *Trent v. Valley Elec. Ass'n,* 41 F.3d 524, 526 (9th Cir.1994)) (further stating that this definition "comports with our interpretation of the anti-retaliation provision of Title VII.").

This element is not disputed. Dunlap asserts that his protected activities included his internal compliance complaints[172] and his call to the Providence Integrity Line in April 2014. Imaging Associates concedes that Dunlap's call to the Providence Integrity Line was protected activity[173] and does not contest the remaining conduct at issue.[174] Thus, the Court considers both these factual grounds in evaluating the remaining elements of Dunlap's *prima facie* case.

2. Whether Imaging Associates had Knowledge of Dunlap's Protected Activity

Next, Dunlap must demonstrate that Imaging Associates knew about his protected activity. Dunlap asserts that Radecic, Hinger, and the physicians at Imaging Associates knew about his internal complaints, and that from this they also figured out that he was the Providence Integrity Line caller.[175] The record is only sufficient, however, to establish that Radecic and Hinger knew about Dunlap's call to Providence Integrity Line.[176] Dunlap has not met his burden to establish this element of his *prima facie* case for any of the other conduct alleged. The evidence is insufficient to conclude that his internal complaints placed Imaging Associates on notice that he

---

[172] At oral argument, when asked to define the scope of the potentially fraudulent conduct that Dunlap was investigating, Dunlap represented that his concerns were those found in the Aegis Audit. *See* Dkt. 284. In the interest of ensuring a thorough analysis, however, the Court will consider Dunlap's internal complaints to encompass all his vein program concerns, including the pre-filled prescription pads, unlabeled syringes, the Trunk Road Laser, and the vein program workflow concerns, as identified in Dunlap's briefing. *See* Dkt. 260 at 8–9.

[173] Dkt. 269 at 10 (stating that Imaging Associates "did *not* move for summary judgment on the ground that [Dunlap] engaged in no protected activities").

[174] Imaging Associates instead argued that Dunlap did not properly plead that this conduct was a part of the protected activities that ultimately led to his termination, thus barring him from asserting this factual basis for his claims at the summary judgment stage. The Court has already resolved this issue in Dunlap's favor, *see supra* Part IV.A at 28–30, and thus includes that conduct here.

[175] Dkt. 260 at 18–20.

[176] Dkt. 260 at 19.

was investigating fraud; and, similarly, no evidence suggests that anyone else at Imaging Associates knew that Dunlap was the Providence Integrity Line caller until after Dunlap's termination.

"Unless an employer is aware that its employee is investigating fraud, the employer cannot 'possess the retaliatory intent necessary to establish a violation of § 3730(h).'"[177] Ordinarily, this requires only that the employer have general knowledge that the employee is investigating a potential fraud.[178] However, where an employee's role includes reporting compliance violations, this standard is heightened.[179] "[E]mployees whose complaints fall within the scope of their job duties must provide their employers with clear notice of their intent to pursue an FCA action in order to satisfy the second element of a retaliation action under the statute[.]"[180]

---

[177] *Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243, 1254 (W.D. Wash. 2011) (citing to *Hopper*, 91 F.3d at 1269, and *Robertson v. Bell Helicopter Textron,* 32 F.3d 948, 950–52 (5th Cir.1994)). *See also United States ex rel. Lim v. Salient Federal Solutions, Inc.*, 2018 WL 2128666, at *5 (S.D. Cal. May 9, 2018) (citing *U.S. ex rel. Lockyer v. Hawaii Pac. Health*, 490 F. Supp. 2d 1062, 1084 (D. Haw. 2007)).

[178] *See Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1104 (9th Cir. 2008).

[179] *United State ex. rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 908 (9th Cir. 2017) (holding that "when an employee is tasked with such investigations, it takes more than an employer's knowledge of that activity to show that an employer was on notice of a potential *qui tam* suit." (citing *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996) and *Robertson*, 32 F.3d at 952)).

[180] *Sicilia*, 775 F. Supp. 2d at 1254. The Western District of Washington, in deciding *Sicilia*, noted "the Ninth Circuit has yet to explicitly consider the issue" of notice for employees whose purported protected activity overlaps with their job duties, but cited to cases from the 6th and 10th Circuits. In July 2017, the Ninth Circuit decided *Campie*, resolving the issue. This holding is also consistent with the 3rd, 4th, and 5th circuits on this point. *See Tribble v. Raytheon Company*, No. CV 07-3058-JFW (SHX), 2009 WL 10672763, at *4 (C.D. Cal. Sept. 23, 2009), *aff'd*, 414 F. App'x 98 (9th Cir. 2011) (collecting cases).

### a. *Knowledge of Dunlap's Internal Complaints as Protected Activity*

The Court first examines whether Dunlap's internal complaints put Imaging Associates on notice that he was investigating fraud. Under Ninth Circuit law, a plaintiff whose job responsibilities include compliance must meet a higher standard to place her employer on notice of protected activity. "Where a plaintiff merely advised her superiors of noncompliance and warned of consequences for noncompliance, and her monitoring and reporting activities were required to fulfill her job duties, defendants did not have notice the plaintiff was furthering or intended to further an FCA action."[181] In these cases, "'the employee must make it clear to the employer that the employee's actions go beyond the assigned task' in order to overcome the presumption that he is merely acting in accordance with his employment obligations."[182]

Dunlap argues that because Dunlap did not serve as Imaging Associates' compliance officer, this standard should not apply and his concerns were sufficient as raised to place Imaging Associates on notice that he was engaged in protected activity.[183] Dunlap also asserts that this

---

[181] *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. CV06-1381PHXNVW, 2009 WL 1457036, at *10 (D. Ariz. May 21, 2009), *aff'd sub nom. Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011) (citing *Ramseyer*, 90 F.3d at 1522).

[182] *Tribble*, 2009 WL 10672763, at *4 (internal punctuation omitted) (quoting *Eberhardt v. Integrated Design & Construction, Inc.*, 167 F.3d 861, 868 (4th Cir. 1999)).

[183] Dkt. 260 at 15–16. Curiously, Dunlap advances this argument in the context of the first element, arguing under *Campie* and related cases for the proposition that Dunlap's internal complaints constituted protected activity. *See* Dkt. 260 at 11–17. This argument conflates the standards for the two elements—protected activity and knowledge thereof—and argues as to a point that Imaging Associates has already conceded, namely, that Dunlap engaged in protected activity. Nonetheless, in the interest of fully addressing all arguments, the Court considers Dunlap's arguments regarding the heightened standard when addressing Imaging Associates' knowledge of the protected activity.

standard should not apply because Dunlap's internal complaints "included improper billing practices," and billing was not within Dunlap's role as Director of Operations.[184]

This argument is unpersuasive. The heightened notice standard does not require that the relator be formally responsible for all compliance tasks, nor does it require the employee be responsible for only compliance tasks.[185] Rather, the standard applies if "the monitoring and reporting activities outlined by relators are by and large the types of activities [the] relator was required to undertake as part of [their] job."[186] Although Imaging Associates employed a separate compliance officer—Anita Moran—it is not disputed that Dunlap's role included "ensuring that [Imaging Associates was] compliant with governmental regulations [and] operations and processes[.]"[187] Dunlap's responsibilities as Director of Operations included "reporting and evaluating compliance concerns," and "investigating and reporting any fraud."[188] Indeed, Dunlap

---

[184] Dkt. 260 at 14–15. As discussed, the Court's understanding of Dunlap's allegations is that billing issues were involved only to the extent that they were incidental to, or a related consequence of, his other compliance concerns; in particular, the vein program workflow and the Trunk Road Laser, which was plainly within the scope of his job responsibilities. *See* Dkt. 260 at 4 (describing Dunlap's concerns regarding the Trunk Road Laser billing arrangement); *id*. at 5 (stating that Aegis Audit recommended that Imaging Associates "ensure billing complies with 'Alaska corporate practice of medicine and laws and rules.'" (quoting Dkt.75-11 at 5)). Dunlap's briefing also generically refers to "improper billing practices" in connection with the Aegis Audit, but Dunlap testified at deposition that the Aegis Audit "didn't look into the billing practices" of the vein program. Dkt. 242-3 at 11.

[185] *See Campie*, 862 F.3d at 908 (citing to *Robertson*, 32 F.3d at 952).

[186] *United States v. Somnia, Inc.*, No. 1:15-cv-00433-DAD-EPG, 2018 WL 684765, at *10 (E.D. Cal. Feb. 2, 2018) (internal punctuation omitted) (citing *Campie*, 862 F.3d at 908).

[187] *Id*. (citing to Radecic deposition). Dunlap's opposition concedes that "Dunlap's job description included insuring that the company complied with the law," Dkt. 26- at 14, and further agrees that Dunlap "worked on compliance generally, including ensuring that Imaging Associates met the accreditation for equipment and ensuring that staff were managed to comply with HIPAA laws." Dkt. 260 at 16.

[188] Dkt. 241 at 34 (citing to Dunlap's statements in his deposition).

himself specifically responded in the affirmative at deposition when asked whether his job duties "included reporting and evaluating compliance concerns;" and stated that it was his job to "investigate and report any fraud."[189] The Court thus concludes that monitoring for compliance issues was within the scope of Dunlap's job, and that "a more comprehensive notice" is thus required.[190]

Applying this standard, Dunlap's internal complaints "did not place [Imaging Associates] on notice that [Dunlap] was not merely performing his job duties as a member of [Imaging Associates] management."[191] Dunlap provides no evidence indicating he ever communicated an intention to elevate his concerns, nor does he provide evidence that anyone at Imaging Associates would have been aware that he intended to pursue a compliance action, such as an FCA claim. To the contrary, to the extent that Dunlap had ongoing concerns regarding some of the issues he initially raised in early 2013,[192] Dunlap testified that during 2014, he only raised these concerns

---

[189] Dkt. 242-2 at 14–15. Similarly, Dunlap's contentions that he should not be subject to the heightened notice standard because his complaints regarding billing issues went beyond his job duties are unpersuasive. *See* Dkt. 260 at 17. This is particularly true given that his job duties included Medicare and Medicaid compliance, "monitoring monthly income statements," and budgeting. *See* Dkt. 242-2 at 16. Moreover, Dunlap has made only limited references to billing concerns in asserting the factual basis for his protected activity and does not provide any evidence that he raised these concerns as a separate issue with Imaging Associates.

[190] *Somnia*, 2018 WL 684765, at *10.

[191] Dkt. 241 at 32

[192] Dunlap raised concerns about the Trunk Road Laser in "spring and summer of 2013," but "dropp[ed] the issue" after summer 2013 when so requested by Dr. Inampudi. Dkt. 260 at 4. Similarly, the evidence in the record indicates that Dunlap's concerns regarding the use of pre-filled prescription pads and unlabeled syringes were resolved in 2013, and nothing in the record indicates that either of these practices continued or occurred again. *See* Dkt. 242-4 at 25–27. Dunlap's ongoing concerns therefore appear limited to the vein program workflow.

"in passing" with Radecic, and that he "express[ed] frustration" to Dr. Reed.[193] In fact, Radecic testified that he viewed Dunlap's internal complaints as part of Dunlap's role, and that his impression was that "as management, we were together trying to scope the situation, what was going on, come up with the alternatives that we could take to rectify those situations and to implement those changes."[194] "In such circumstances, a defendant is put on notice only where [the plaintiff] has suggested that she intends to use the alleged noncompliance as the basis for an FCA claim, or else intends to report the misconduct to government officials."[195]

Thus, to the extent that Dunlap's employment retaliation claims are predicated on his internal complaints, Dunlap has not stated a *prima facie* case because Imaging Associates lacked knowledge that he was engaged in protected activity when he voiced these concerns.

### b. Knowledge of Dunlap's Identity as the Providence Integrity Line Caller

However, Dunlap has established that both Hinger and Radecic knew he was the Providence Integrity Line caller. It is undisputed by the parties—based on Radecic's testimony— that Radecic deduced Plaintiff's identity as the caller after reading the HR Umbrella Report.[196] And, while the parties dispute whether Hinger knew Dunlap's identity as the caller, Imaging

---

[193] Dkt. 242-4 at 9. Notably, Dr. Reed did not work on the vein program, nor was he a board member of Imaging Associates during Dunlap's tenure. Dr. Reed also testified that he became "less close" to Dunlap over time because "there were a lot of issues happening around [Dunlap] that I didn't want to be a part of," and because he "started to receive a lot of complaints from our employees . . . about the way [Dunlap] treated them, and it wasn't something I wanted to support." Dkt. 242-8 at 3.

[194] Dkt. 242-6. Radecic further stated that he assumed Dunlap's status changed after Dunlap called the Providence Integrity Line and reported his concerns externally. *Id.*

[195] *Hardin v. Mendocino Coast Dist. Hosp.*, No. 17-cv-05556-JST, 2018 WL 2984834, at *3 (N.D. Cal. June 13, 2018) (citing *Somnia*, 2018 WL 684765, at *10).

[196] Dkt. 260 at 19.

Associates concedes that, for purposes of summary judgment, the Court must rely on Dunlap's testimony that he informed Hinger of this fact during their August 1, 2014 meeting.[197]

However, to the extent that Dunlap argues that others at Imaging Associates knew he was the Providence Integrity Line complainant, Dunlap has not so demonstrated. Dunlap argues that the Court should also conclude that Drs. Inampudi, Reed, and Kottra knew he was the complainant behind the Providence Integrity call.[198] No direct evidence supports this contention;[199] but Dunlap argues that these physicians must have figured out Dunlap's identity because of similarities between the complaints raised in the Providence Integrity Line phone call and the issues Dunlap had previously raised in connection with the Aegis Audit.[200]

This argument falls short, as it does not rely on a reasonable inference but an assumption that is contradicted by the sworn testimony on the record. "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."[201] Where the evidence "establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur."[202]

---

[197] Dkt. 241 at 23.

[198] Dkt. 260 at 19.

[199] Indeed, Drs. Inampudi, Reed, and Kottra have all represented that they did not know, or even assume, that Dunlap was the Providence Integrity Line caller, and all have stated they were unaware of his identity as such until after his termination. *See* Dkt. 242-7 at 3–6; Dkt. 242-8 at 11; Dkt. 249 at 1. It is undisputed that Radecic did not share his knowledge of this fact with anyone else at Imaging Associates. Dkt. 260 at 19.

[200] Dkt. 260 at 19–20.

[201] *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citing *Mackie v. Rieser,* 296 F.3d 909, 915–16 (9th Cir. 2002); *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir. 1988)).

[202] *Cafasso*, 637 F.3d at 1061.

Dunlap argues that this inference is warranted because "no other employee besides Mr. Dunlap made the complaints identified in the HR Umbrella report,"[203] but the record does not support this assertion. First, the issues raised by the Providence Integrity Line complainant and those detailed in the Aegis Audit are not identical; indeed, the Aegis Audit did not reference any issues with pre-filled prescription pads, pre-filled syringes, the Trunk Road Laser, or anything relating to a hostile work environment.[204] Moreover, by April 2014 when the Providence Integrity Line call was placed, many individuals at Imaging Associates were aware of these issues such that they could have asserted them to an outside party.[205] And, by mid-2014, Dunlap stated that he was only expressing these concerns to Radecic; thus, the Court cannot presume that Drs. Inampudi, Reed, and Kottra were as familiar with Dunlap's concerns as Radecic was, and thus cannot presume that the three physicians would have arrived at the same conclusion that Radecic did regarding the caller's identity.[206] Thus, to infer that Dunlap's identity as the Providence Integrity

---

[203] Dkt. 260 at 22.

[204] *See generally* Dkt. 242-13 (HR Umbrella report with Aegis Audit attached).

[205] Specifically, the Executive Summary of the HR Umbrella report states that "five employees indicated they were aware of issues at the Trunk Road location regarding the laser," and that "[t]hree had more specific information" about the situation. Dkt. 242-13 at 5. Similarly, that report indicated that "four employees possessed the most knowledge about the vein program," that "five employees had some knowledge about the allegation of pre-signed prescription pads used in the vein therapy program," and referencing the allegation that an RN was practicing outside her licensure, that "all employees interviewed had some knowledge of how the diagnostic process worked." Dkt. 242-13 at 5.

[206] This is particularly true for Dr. Reed. Although he was the recipient of Dunlap's complaints due to the friendly relationship he originally had with Dunlap, Dr. Reed did not work on the vein program, and thus testified that he often lacked the context to understand the details of Dunlap's concerns. *See, e.g.*, Dkt. Dkt. 242-8 at 6, 10–11 (stating, regarding an email about the Trunk Road Laser, that "[a]t the time, it would have meant literally nothing to me").

Line caller was known to any of the physicians at Imaging Associates would "require undue speculation."[207]

In sum, Dunlap has established the second element of his *prima facie* case, but on a narrower factual ground that what he asserted. Dunlap has met his burden only insofar as he has established that Hinger and Radecic knew of his identity as the Providence Integrity Line caller.

3.   Whether Dunlap has shown "But For" Causation

Third, and finally, Dunlap must show that he was terminated because of his protected activity.[208] This element requires a showing of "but for" causation: Dunlap must demonstrate that his termination would not have occurred "in the absence of—that is, but for" the impermissible retaliation by the employer.[209] Having narrowed the factual grounds on which Dunlap has established the first two elements of his *prima facie* case, the Court considers this final element only in the context of Dunlap's call to the Providence Integrity Line, and Radecic and Hinger's knowledge of that call.

Imaging Associates maintains that Dunlap's allegations are insufficient to state a *prima facie* case as to this element, causation, because "it is undisputed that [Dunlap's] performance issues not only pre-dated his meeting with Hinger, but were sufficiently severe to prompt [Imaging Associates] to begin searching for his replacement even before he called the [Providence Integrity

---

[207] *Cafasso*, 637 F.3d at 1061.

[208] *See United States v. Health*, No. 13-cv-01924-SI, 2016 WL 3540954, at *12 (N.D. Cal. June 29, 2016).

[209] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47, 352 (2013) (holding that the language "because of" found in Title VII's anti-retaliation provision required a "but for" causation standard (citing to *Gross v. FBL Fin Servs., Inc.*, 557 U.S. 167, 176 (2009))). At oral argument, the parties agreed this is the appropriate standard for Dunlap's FCA retaliation claim. Dkt. 284.

Line].”[210] In response, Dunlap argues that, to survive summary judgment, he need only show temporal proximity between the protected activity and the termination to support an inference of causation.[211]

On summary judgment, "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases."[212] This is particularly true "when an adverse employment action follows on the heels of protected activity," as this can establish a causal inference that creates a triable issue for a jury.[213] However, this rule is not absolute, and this inference does not follow automatically after a specific length of time is established. In fact, "'there is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation,'" rather, "courts must consider the surrounding circumstances."[214]

---

[210] Dkt. 269 at 25.

[211] In briefing, Dunlap did not argue that he has satisfied the "but for" causation standard. Instead, he asserted that he need only "provide evidence that his protected activity and the negative employment action are not completely unrelated." Dkt. 260 at 24. At oral argument, however, Dunlap conceded that the "but for" causation standard is appropriate but argued that this standard could be met on summary judgment if Dunlap could establish causation by showing temporal proximity. Dkt. 284.

[212] *Bell v. Clackamas Cty.*, 341 F.3d 858, 865 (9th Cir. 2003). *See also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Robinson v. Alameda Cty.*, No. 12-CV-00730-JCS, 2013 WL 4494655, at *22 (N.D. Cal. Aug. 19, 2013), *aff'd,* 680 F. App'x 568 (9th Cir. 2017) ("On summary judgment, causation 'may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'" (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir.2006))).

[213] *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

[214] *Lillie v. ManTech Int'l Corp.*, No. 2:17-cv-02538-CAS-SS, 2018 WL 6133706, at *8 (C.D. Cal. Sept. 24, 2018) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003)).

Dunlap argues that he has met his burden regarding this element based solely on the facts that Dunlap informed Hinger on August 1, 2014 that he was the Providence Integrity Line caller, Hinger determined Dunlap's termination was necessary on August 6, 2014, and Hinger terminated Dunlap on August 13, 2014. Dunlap argues that these events, taken in isolation—which unfolded in the span of less than two weeks—are sufficient alone to support a causal inference and thus carry Dunlap's burden on the third and final element of his *prima facie* case.

However, when the events that Dunlap points to are examined in context, the timeline leading to Dunlap's termination is substantially more complex than what is revealed by looking only to this brief, two-week period. And, the broader timeline that is established by the record as a whole is insufficient to show causation.

First, the undisputed facts show that Radecic, with support from the Imaging Associates Physicians, had decided that Dunlap's termination was warranted and necessary—and took steps in furtherance of that termination—before any protected activity that remains at issue occurred. As previously determined, Imaging Associates did not know that Dunlap's internal complaints were made in furtherance of an investigation into fraud or were protected activity under the FCA. Thus, in assessing causation, the Court looks only to the conduct for which Imaging Associates possessed the requisite knowledge: Dunlap's calls to the Providence Integrity Line.[215] Dunlap placed these calls, and reported his concerns to Imaging Associates' board member Morton, in April and early May 2014.[216] Radecic did not deduce Dunlap's identity as the caller until he saw

---

[215] *See supra* Part IV.B.2 at 38–40.

[216] *See* Dkt. 242-2 at 5.

the HR Umbrella Report, which was distributed to the Imaging Associates Physicians and management on June 30, 2014.[217] Hinger learned Dunlap was the caller on August 1, 2014. [218]

Imaging Associates' determination that Dunlap's performance was sufficiently poor to justify termination predates both the protected activity itself—*i.e.*, Dunlap's April 2014 calls—and Imaging Associates' subsequent knowledge thereof. By December 2013, many of the Imaging Associates Physicians were dissatisfied with Dunlap's performance and calling for his termination. On April 13, 2014—before Dunlap called the Providence Integrity Line—Radecic started the process of securing a replacement for Dunlap's position. And, the record shows that prior to August 1, 2014, Hinger was aware that staff had complaints about Dunlap's performance, and that many of the Imaging Associates Physicians were requesting Dunlap's termination because of Dunlap's deficient performance.

In sum, the record shows that the decision to terminate Dunlap predates both his protected activity and Imaging Associates' knowledge thereof. Because of this, the temporal proximity of Dunlap's protected activity and his termination cannot, alone, support an inference of causation.[219] Dunlap offers no additional evidence to support a *prima facie* case for causation, nor can the Court discern any from the record. The Court thus concludes that the connection between Dunlap's protected activity and his termination is too attenuated to satisfy the "but for" causation standard.

---

[217] *See* Dkt. 242-6 at 12.

[218] *See* Dkt. 242-2 at 7.

[219] This is particularly true in light of the fact that no evidence suggests Dunlap's protected activity was ongoing when Hinger learned Dunlap's identity as the Providence Integrity Line caller on August 1, 2014. Rather, Dunlap had placed the calls several months' prior; the investigation into his allegations had already been completed, and HR Umbrella's final report was already shared with Imaging Associates' management, physicians, and board. *See* Dkt. 242-6 at 12.

Accordingly, Dunlap has not satisfied the final element, and thus has not articulated a *prima facie* case for retaliation under the FCA.

C. *Imaging Associates' Legitimate Non-Retaliatory Reason for Dunlap's Termination and Dunlap's Rebuttal*

Having determined that Dunlap did not articulate a *prima facie* case for employment retaliation, the Court need not reach the remainder of the *McDonnell Douglas* burden shifting analysis to resolve Dunlap's claim for employment retaliation under the FCA. Even if, *arguendo*, the temporal proximity of Dunlap's protected activity was sufficient to support an inference of causation, and he had stated a *prima facie* case, Dunlap's claim still fails. Imaging Associates has set forth a legitimate non-retaliatory reason for Dunlap's termination, and Dunlap has not demonstrated that this reason is pretext.

1. Whether Imaging Associates Has Provided a Legitimate Non-Retaliatory Reason for Dunlap's Termination

The burden on an employer to articulate a legitimate non-retaliatory reason for an employee's termination is "merely a burden of production, not one of proof."[220] In fact, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons;]" but "[t]he explanation provided must be legally sufficient to justify a judgment for the defendant."[221] If the defendant employer meets this burden, "[t]he employer's articulation of a facially nondiscriminatory reason shifts the burden back to the plaintiff to show that the employer's reason was a pretext for discrimination."[222]

---

[220] *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-GMS, 2018 WL 1784692, at *13 (D. Ariz. Apr. 13, 2018) (citation and quotation marks omitted).

[221] *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 2248, 254–55 (1981).

[222] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

Imaging Associates offers an extensive recounting of Dunlap's performance problems. As early as 2013, physicians and staff were dissatisfied with Dunlap's management style, his communication with staff and management, and his ability to handle necessary tasks. Imaging Associates provides evidence of personnel clashes that Dunlap was involved in, and also recounts how Dunlap became increasingly unresponsive to both staff and physicians over time. In addition, the Medical Director, many Imaging Associates Physicians, and Radecic were also dissatisfied with Dunlap's handling of key projects; in particular, his poor management of the ACR accreditation process and his inability to complete certain functions during the PACS rollout.

It is undisputed that, by 2014, the Imaging Associates Physicians were largely dissatisfied with Dunlap's performance. By April 2014, Radecic had determined that Dunlap's performance was unsatisfactory and engaged an outside firm to secure his replacement. And, when Hinger took over as CEO in August 2014, he reached the same conclusion.[223] Thus, while no single failure led to Dunlap's termination, Imaging Associates contends that it was the whole of these issues that ultimately led Hinger—acting for Imaging Associates—to conclude that Dunlap's continued employment had become untenable.[224] These issues, collectively, establish a legitimate non-retaliatory reason for Dunlap's termination: Dunlap's poor performance.

---

[223] Hinger noted that some of the physicians and Radecic "were expressing concerns about [Dunlap's] performance" but that he "wanted to make [his] own determination." Dkt. 242-5 at 14–15, 19. Hinger concluded "that it was not possible to retain Gregg Dunlap due to a variety of performance issues and the culture, his relationship with the staff." *Id.* at 17. In enumerating these problems, Hinger specifically noted (1) Dunlap's lack of availability; *id.* at 12; (2) issues with PACS and ACR accreditation; *id.* at 21; and (3) Dunlap's "dysfunctional" relationship with the staff; *id.* at 22–23. Hinger also stated that Dunlap's decision to engage in a romantic relationship with a colleague was evidence of "poor decision making." *Id.* at 23.

[224] *See, e.g.*, Dkt. 242-7 at 16 (testimony from Dr. Inampudi characterizing the problems with Dunlap as "a pile-up of issues"); Dkt. 242-5 at 20 (stating "there were many reasons" for Dunlap's termination, and noting as examples the problems with PACS, "compliance issues with regards to the certification [ad] credentialing of our equipment [and] modalities with the American College of Radiology," and "the relationships between [Dunlap] and the staff, particularly the clinical

## 2. Whether Dunlap Has Demonstrated that Imaging Associates' Proffered Reason for Dunlap's Termination is Pretext

The burden thus returns to Dunlap to demonstrate that Imaging Associates' proffered reason is "merely pretext for impermissible retaliation."[225] Dunlap has not done so. "[A] plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing."[226] In general, a "[p]laintiff may prove pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"[227] "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial."[228] However, "[i]f [the] plaintiff offers indirect evidence that 'tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not

---

staff"); Dkt. 242-8 at 3 (testimony from Dr. Reed describing that Dunlap "became less and less responsive to his job obligations and less and less responsive to me over time" and stating "[t]here were many examples where I pointed out deficiencies that he should have been on").

[225] *See Berglund*, 835 F. Supp. 2d at 1040 ("Accordingly, if Berglund establishes a *prima facie* case for retaliation, the burden of production shifts to Boeing to articulate a legitimate non-retaliatory explanation for the adverse employment action. If Boeing successfully rebuts the inference of retaliation, the burden of production shifts back to Berglund to show Boeing's proffered explanation is merely pretext for impermissible retaliation." (internal citations omitted)).

[226] *Godwin*, 150 F.3d at 1220. *See also Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991) ("We have made clear that a plaintiff cannot defeat summary judgment simply by making out a prima facie case.").

[227] *Brazill v. Cal. Northstate Coll. of Pharmacy, LLC*, 949 F. Supp. 2d 1011, 1020 (E.D. Cal. 2013) (quoting *Godwin,* 150 F.3d at 1220). *See also Burdine,* 450 U.S. at 256; *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094–95 (9th Cir. 2005).

[228] *Godwin*, 150 F.3d at 1221 (internal quotation marks and citation omitted) (explaining that direct evidence is that which proves discriminatory animus without inference or presumption).

believable,' such evidence must be 'specific' and 'substantial' in order to create a triable issue of fact as to whether the College had a discriminatory motivation."[229]

Dunlap offers no direct evidence of a retaliatory motive; Dunlap relies on circumstantial evidence and advances two arguments as rebuttal.[230] First, Dunlap argues that the "temporal nexus" between Imaging Associates' notice of his protected activity and his termination demonstrates that Imaging Associates' stated reason for the termination are pretext.[231] This argument is unavailing. Absent some other support, "mere temporal proximity is generally insufficient to show pretext."[232] This is particularly true where, as here, calls for Dunlap's

---

[229] *Brazill*, 949 F. Supp. 2d at 1020 (quoting *Godwin,* 150 F.3d at 1222 and citing *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1029 (9th Cir. 2006)). *See also Sears v. Housing Auth. of the Cty. of Monterey*, 2014 WL 1369594, at *10 (N.D. Cal. April 7, 2014).

[230] Dunlap also briefly advances the argument that, once Radecic discerned Dunlap's identity as the Providence Integrity Line caller, Imaging Associates should have been "estopped from terminating or replacing" Dunlap. *See* Dkt. 260 at 23. Dunlap provides no support for this contention, nor is the Court aware of any. Indeed, in *Nassar*, the Supreme Court specifically sought to guard against the possibility that an employee "who knows that he or she is about to be fired for poor performance," might seek to "forestall that lawful action" by advancing a retaliation claim. *Nassar*, 570 U.S. at 358–59. Moreover, Dunlap fails to articulate how this argument goes to the issue of pretext, as this fact does not obviate the undisputed facts regarding Dunlap's performance problems, nor does it show that this explanation is "unworthy of credence" or "motivated by unlawful retaliation" such that it is pretextual. *See Winston v. Toshiba America Electronics Components, Inc.*, 274 F.3d 1276, 1286 (9th Cir. 2001) (citing *Godwin*, 150 F.3d at 1220).

[231] Dkt. 260 at 24–26.

[232] *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014). *See also Hooker v. Parker Hannifin Corp.*, 548 F. App'x 368, 370 (9th Cir. Nov. 20, 2013); *Huck v. Kone, Inc.,* 539 F. App'x 754, 755 (9th Cir. 2013); *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1070 (9th Cir. 2003), *as amended* (Jan. 6, 2004) (noting that "timing, standing *alone*, may be insufficient to raise a genuine issue with respect to pretext" (emphasis original)). In *Dawson v. Entek Int'l*, the Ninth Circuit stated that "[i]n some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext," but went on to hold that the plaintiff had demonstrated pretext because "the gravity of Dawson's complaint *coupled with* the time frame are such that a reasonable trier of fact could find in favor of [the plaintiff]." 630 F.3d 928, 937 (9th Cir. 2011) (emphasis added).

termination predate Imaging Associates' knowledge of his protected activity,[233] and where no other evidence is offered to suggest pretext. Dunlap does not point to any facts tending to indicate "that the employer's explanation is not credible."[234]

Dunlap also argues that factual disputes regarding his purported performance issues preclude summary judgment.[235] However, Dunlap has not demonstrated any genuine dispute of material fact as to the explanations that Imaging Associates offers. In fact, Dunlap concedes that many of these performance problems occurred, but argues nonetheless that that he should not be held personally responsible for the problems; or contends that the complaints levied against him were unfair or unfounded.[236] This is insufficient.

First, several of Dunlap's purported points of dispute are unsupported by evidence.[237] "The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts."[238] Rather, "[a] party asserting that a fact cannot be or is genuinely disputed

---

[233] Radecic determined Dunlap's conduct warranted termination in April 2014, and Hinger was aware of the dissatisfaction with Dunlap's performance and the requests to terminate Dunlap before his August 1, 2014 meeting with Dunlap. *See* Dkt. 245-14 at 1; Dkt. 245-18 at 1.

[234] *Lindahl*, 930 F.2d at 1437–38. *See also Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) ("While this evidence [of temporal proximity] was sufficient to establish a prima facie case . . . it does not constitute a 'substantial' offering sufficient to overcome [the] proffered legitimate, nondiscriminatory reason for terminating her employment." (internal citation omitted)).

[235] Dkt. 260 at 26–28.

[236] For example, regarding the PACS rollout, Dunlap contends that the problems were caused by the vendor and software limitations. Similarly, Dunlap argues that the ACR accreditation process was fraught with issues because of mistakes by other staff. And, Dunlap contends that many of the individuals who were complaining about him to certain physicians and to Radecic were advancing baseless complaints. *See, e.g.*, Dkt. 281-1 at 1–3, 16–18, 21–22.

[237] *See, e.g.*, Dkt. 260-1 at 16–17.

[238] *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-GMS, 2018 WL 1784692, at *2 (D. Ariz. Apr. 13, 2018) (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

must support the assertion by: (A) citing to particular parts of materials in the record or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[239] Dunlap's blanket assertions of disagreement with certain performance problems that Imaging Associates has identified do not meet this standard.

More critically, though, it is undisputed that, whether rightfully or not, many Imaging Associates Physicians, and Dunlap's management, were dissatisfied with Dunlap's performance.[240] While Dunlap raises ancillary issues and disagrees with the blame that he received for certain problems, the record is clear—and Dunlap concedes—that Imaging Associates faced problems in areas for which he was responsible.[241] Certainly, it is possible that Hinger, Radecic, Dr. Inampudi, and others at Imaging Associates who advocated for Dunlap's termination were mistaken in these opinions. But a difference of opinion is not pretext. "[T]he Court's role is to remedy discrimination, not to 'assume the role of a super personnel department, assessing the merits—or even rationality—of employers' nondiscriminatory business decisions."[242] The

---

[239] *Id.* (internal punctuation omitted) (citing Fed. R. Civ. P. 56(c)).

[240] Evidence in the record shows that dissatisfaction with Dunlap's performance and calls for his termination began in late 2013, before anyone at Imaging Associates knew about any of Dunlap's protected activity. The record also demonstrates—and Dunlap acknowledges—that Radecic, acting for Imaging Associates, decided that Dunlap's performance issues warranted termination on or about April 13, 2014. Dkt. 245-14. And, a July 30, 2014 email from Dr. Inampudi to Hinger specifically communicated the request that Hinger terminate Dunlap and asked if Hinger "had a chance to review some applications" or had "someone in mind" for the role. Dkt. 245-18 at 1.

[241] At oral argument, Dunlap conceded that he was ultimately responsible for supervising the ACR accreditation process, that he shared responsibility for the PACS rollout, and that the problems with both resulted from a combination of his both own performance failures and certain external factors. Dkt. 284.

[242] *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1221 (W.D. Wash. 2018), *aff'd*, No. 18-35434, 2019 WL 2775566 (9th Cir. July 2, 2019) (citing *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 250 (1st Cir. 1997)). Thus, "[i]n judging whether [the] proffered justifications were 'false,' it

evidence Imaging Associates provides uniformly points to performance issues predating any protected activity by Dunlap.

Where, as here, "evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption."[243] Dunlap has not provided evidence sufficient to show that the legitimate non-retaliatory reason for his termination offered by Imaging Associates is pretext, nor has he demonstrated a genuine dispute of material fact such that a rational trier of fact could find for Dunlap on this point.

Accordingly, Imaging Associates' Motion for Summary Judgment is **GRANTED** as to Count V, Dunlap's claim for employment retaliation under the False Claims Act.

### D.  *Claim for Breach of the Covenant of Good Faith and Fair Dealing Under Alaska Law*

Finally, the Court turns to Dunlap's claim for breach of the implied covenant of good faith and fair dealing under Alaska law.[244] Under Alaska law, retaliatory discharge by an employer

---

is not important whether they were *objectively* false . . . Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo*, 281 F.3d at 1063 (internal punctuation and quotation marks omitted) (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)). *See also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000); *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (citing *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)) ("In considering the pretext issue, 'our inquiry is limited to whether the employer gave an honest explanation of its behavior,' not whether its action was wise, fair, or correct."); *Rojas v. Fla.*, 285 F.3d 1339, 1342 (11th Cir. 2002) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.")); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.").

[243] *Wallis v. J. R. Simplot Co.*, 26 F.3d 885, 890–91 (9th Cir. 1994).

[244] The Court need not exercise jurisdiction over this claim as it has already granted summary judgment on the only claim that presents a federal question. *See* 28 U.S.C. § 1367(c)(3). However,

"may give rise to a claim for breach of the implied covenant of good faith and fair dealing."[245] The *prima facie* elements and the burden shifting analysis applied for such a claim mirrors that which the Court applied for Dunlap's FCA retaliation claim: Specifically, under Alaska law:

> To make out a *prima facie* case, an employee must show that she engaged in protected activity, her employer subjected her to an adverse employment action, and there was a causal link between the protected activity and the adverse action. The burden then shifts to the employer to offer evidence of a legitimate reason for the adverse action. Upon such a showing, the burden shifts back to the employee to offer evidence that the employer's explanation is merely a pretext.[246]

The parties did not separately brief this second claim, and the Court does not find that a separate analysis is necessary. For the reasons already stated, Imaging Associates is entitled to summary judgment on this claim because they have provided a legitimate non-retaliatory reason for Dunlap's termination, which Dunlap has not demonstrated to be pretext.[247] Accordingly, Imaging Associates' Motion for Summary Judgment is **GRANTED** as to Count VI, Dunlap's claim for breach of the implied covenant of good faith and fair dealing under Alaska law.

---

the Court will reach the merits of Dunlap's Alaska law claim because the analysis is substantially similar to that of the already-decided FCA claim, as explained herein.

[245] *Beach v. Handforth-Kome*, 314 P.3d 53, 57 (Alaska 2013) (internal citations omitted).

[246] *Id.* at 57–58.

[247] The Court notes that Dunlap likely did state a *prima facie* case for his claim under Alaska law. Unlike FCA claims, under Alaska law, the third element—causation—requires only a "causal connection" between the protected activity and the employer's adverse action and not "but for" causation. *See Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 433 (Alaska 2004) (citing *VECO, Inc. v. Rosebrock*, 970 P.3d 960, 921 (Alaska 1999)). Dunlap's claim nonetheless fails, however, under the remainder of the burden shifting analysis.

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment at docket 241 is **GRANTED**, and the Motion to Strike Expert Witness at docket 215 is **DENIED AS MOOT**.

Having resolved all claims against all parties, the Clerk of the Court is directed to close this case.


IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 20th day of September, 2019.

/s/*Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE